Good morning. May it please the Court, I am Rebecca Herbst representing the Defendant. I would like to reserve four minutes for rebuttal. The last time we were here, everyone agreed, including Dr. Pettit, that only the CRI Director could hold the Dalton chair. This Court left very little to litigate after its ruling on qualified immunity. The issue was whether under Arizona law could Dr. Pettit have a property right in the directorship without a contract, document, or express promise. And the district court correctly held that he did not. The district court then erred by independently considering whether Dr. Pettit could have a property right in the Dalton chair, despite acknowledging that the Dalton agreement required the director to hold the chair, and despite this Court's holding. Sotomayor, could I just stop you there? Because if you follow that, I'm on board so far, but then doesn't the document say that if the Cancer Research Institute didn't exist, then the chair goes to the chemistry department? Yes, Your Honor. So it contemplated, in a way, what happened here. At the time that Dr. Pettit was non-renewed from the CRI directorship, the CRI still existed. Correct. So it was Dr. Glick's testimony that as he understood the Dalton agreement, he was required to remove Dr. Pettit from the Dalton chair at that time. It was only, I believe, two years later that the CRI no longer existed, and then ASU took steps to appoint another professor to the Dalton chair. So at the time, they were contractually linked. And the district court said this. Can I ask you this? I'm not familiar, I'll confess, with Arizona, maybe it's Arizona trust law, but when you have a donor who gives money for a particular purpose and attaches conditions to the use of that money, as occurred here, I mean, does Arizona trust law say that basically those conditions are irrevocable, at least on a unilateral basis, that they have to be complied with? Your Honor, to be honest, we have not looked at it in terms of matters of Arizona trust law. Even if the court or even if the contract were set aside, however, assuming the contract didn't require the director to hold the Dalton chair, under Arizona law, Dr. Pettit could not have a property right in the position. I understand you have that argument. I'm not sure I'm persuaded by that. But I do look at the language of that agreement, and it could not be clearer that the two have to go hand in hand. And that's why I was wondering, is there some principle of Arizona trust law that would say, hey, regardless of whether the donee decides I want to do something differently, that that would basically have no effect, given the conditions that were imposed on the use of the money? I am not familiar with any law that would allow that to occur, Your Honor. It is the university was required to apply the contract as it was written. The contract required that the director, too, hold the chair. But he. I assume that if Mr. Dalton had donated money to the university, you know, and said it must be used for purpose X, that just because 30 years later the university decided, you know what, actually this money would be better used for purpose Y, I assume that that wouldn't be permissible, even no matter what kind of understandings everyone agreed to. You still wouldn't say that that could legally be done, right? Exactly, Your Honor. And in this case, the contract required that it be held by the director. So when we were here the first time arguing this case, the Court focused very much on whether Dr. Pettit had a property right only in the directorship, because the two were contractually tied. One of the things I'm sure they'll bring up and I had a question about is this odd circumstance where you had the Cancer Research Center instituted, and then Dr. Pettit didn't actually get the chair until, what, 8 years later? Your Honor, actually he was. That works. He was the appointed director of the Cancer Research Laboratory in 1974. In 1975, that became the Cancer Research Institute. It was Robert Dalton who donated the money in 1978 to create the Dalton chair, and Dr. Pettit was appointed to that chair in 1986. So there is a large gap of time between the appointments. Right. Well, why? I mean, in other words, if the chair, if you have to have the chair and the directorship go hand-in-hand, what accounts for the initial lag time? The chair did not require or, excuse me, the Dalton agreement did not require that Dr. Pettit be appointed to it. So the agreement recommended Dr. Pettit, but also said that it had to be held by the CRI director. And I'm not positive that it is cited in our briefs, but there was evidence at trial that there was a lag in time while the university sought other candidates before they decided to appoint Dr. Pettit to that chair in 1986. Was there any evidence in that interim period that someone other than the plaintiff held that chair? No. It was vacant. It was vacant, Your Honor. So Dr. Pettit was the first appointee to that chair. It was the first endowed chair at Arizona State University. But the district court erred in failing to apply Arizona law in determining whether Dr. Pettit had a property right in that position. Leaving aside the contract, property rights are created by State law. And in Arizona, it's the Arizona Board of Regents that governs employment with State universities. And the Board of Regents has specific policies on tenure which provides a legitimate claim of entitlement to continued employment. And under those policies, only a faculty appointment may receive that continued employment, and neither a director nor an endowed chair fits the definition of a faculty member. But the policy of the State, as I understand it, deals if you're a faculty position and your appointment is dependent on funding, that's one thing. But his appointment to the Dalton chair was not dependent on State funding because the endowment provided funding in perpetuity, did it not? It did. It was an endowment. Why isn't that significantly different than a right of a professor to tenure and payment only to the extent the State can afford to make those payments? Sure. One issue, Your Honor, is that Dr. Pettit actually was never paid as the Dalton chair. He received no additional salary as either the director or the Dalton chair. He only received his salary as a tenured professor. But the board policies. But the Dalton chair agreement or trust or letter would allow money to be used, income from that endowment to be used to pay for his position, if it wished. Isn't that true? That's correct, Your Honor. So he could have, outside the tenured position and payment, he could have been paid solely from the Dalton chair endowment trust. Is that right? That's true, but that doesn't necessarily give him a property right to continued employment in that Dalton chair. Because what the Court failed to acknowledge was Arizona's policies, the Board of Regents' policies, that employees may hold concurrent appointments. You may be a director and a professor, but only the faculty appointment is entitled to tenure. Non-faculty appointments are not. Additionally, the Court failed to acknowledge that there is no authority in any of the policies for the President to grant a lifetime appointment in an endowed chair. The policies are clear and give continued employment in tenured positions. But under Arizona law, an official must have authority to bind the State or an agency. What the district court failed to recognize in this case was that President Nelson wasn't the other party in the contract. It wasn't that Dr. Pettit was trying to bind President Nelson to employ him for life. He's trying to bind the university, the Board of Regents, to continue his employment in the Dalton chair for life. And there's no authority. You keep saying for life, but that's not what, is it Dr. Nelson? Yes. That's not what Dr. Nelson said in his affidavit. He said that he would occupy the chair so long as he was employed by ASU. It wasn't some lifetime thing. It was just contingent upon him remaining a professor at the university. Yes, Your Honor. It's the district court who has called this a lifetime appointment. And so that's why I've been referring to it as a lifetime appointment. The district court could not find that he had tenure under the Board's policies. So it's this undefined. I don't even see it as tenure. It's just linked to his continuing to hold tenure as a professor at ASU. That's what Dr. Nelson said. He didn't say anything about creating some independent lifetime or tenureship in the chair. It's just linked to as long as you're continuing to be employed at our university, you get to hold this chair. The problem with that argument, Your Honor, is that there was no promise actually made to Dr. Pettit. Both Dr. Pettit and Dr. Nelson testified that they had no recollection of ever discussing tenure or the appointment in this position. He was simply appointed to it. But they did form, at least the district court held, they did form a mutual understanding that that was, in fact, that Dr. Nelson's, what he said in the affidavit, was consistent with what both men ended up forming in terms of their mutual understanding. Right. And the error in that problem is that the district court never found that Dr. Nelson had that authority to connect the Dalton chair to his tenured professor position. There's no authority in the policies. In a case that we submitted in a supplemental citation in October of last year, Gorman v. Pima County is very much on point. In that case, a plaintiff argued that they had a contract with Pima County based on their discussions and their dealings with the county administrator. They had documents back and forth in writing, and I believe the plaintiff had given the county somewhere of $80,000. The plaintiff sued to enforce that contract, and the Arizona court said there was absolutely no authority for the administrator to enter into that contract. And the court looked at the county's policies and said if it's not in the policy, if there's no authority for it, the administrator's intent to bind the county is absolutely irrelevant. And that is what happened here. Dr. Nelson's intent to connect this position or to have Dr. Pettit hold the endowed chair as long as he remained at ASU is irrelevant. He did not have the authority to do so. And there's no evidence in the record that he had the authority to do so. I'm having trouble with that principle. Let's assume that they had decided I want to give a million dollars to the university. They create a chair, and I say I don't care whether it's a tenured or non-tenured person, but whoever gets appointed is going to be a lifetime appointment. And they appoint someone. Now, that's outside the tenured structure, and yet, why can't, if the president of the university selects someone and appoints them to this chair that I've created, why would the tenured rules have anything to do with whether or not there's a binding contract there? Two reasons, Your Honor. First, there has to be some authority for the president to bind the university. That authority is typically gained from the policies that are in place. And here we have the tenure policies. In fact, this Court has held on multiple occasions that one university has formal policies on how a property right can be obtained. The employee has to have extraordinary circumstances to circumvent those policies. And that was the Hamowitz case and the Davis v. Oregon case. There's one case that found extraordinary circumstances, but the plaintiff in that case was given a written promise of tenure. He asked that tenure be delayed three years. And the university again promised him in writing that it would do so. Here, there's no evidence of a promise. Every official, and Dr. Pettit has admitted, we all assumed this was the case. There was no discussion of a promise. And there is no evidence that President Nelson had the authority to grant him this right. It would be akin to the court's position. Because he definitely is a tenured faculty member and he remains a tenured faculty member. I don't know who introduced the notion of tenure, whether, you know, it came from maybe when the case got addressed. Here's where I'm having some collision. Maybe you can help me. I hear the contractual argument. It makes sense that that's within the discretion of the university.  And I'm not sure how to reconcile that. I'll call it the bequest. How do you reconcile the bequest, the terms of the bequest, with the district court's findings on what they intended? How do those fit? They don't, Your Honor. The district court acknowledges that the contract required the director to hold the chair. And the district court acknowledges that Dr. Nelson intended him to hold this for life. They're inconsistent positions. And really, under the Gorman case, Dr. Nelson's intent is irrelevant. I have to say to your remaining time. I do. Thank you, Your Honor. May it please the Court. Thad Geyer, Medford, Oregon, here representing the Government Accountability Project's client, who is Dr. Robert Pettit. Thank you, Mr. Geyer. Thank you, Mr. Pettit. One of my favorite things about appearing in this Court is it's a unique opportunity to argue to district judges, because if you're employment lawyers, that's a very hard thing to be able to get anymore. This case was unique because we got to argue and go to a trial with the district judge. And while I appreciate the district judge letting us go to trial on the due process argument, I didn't sign on to the case as the fourth lawyer really for that purpose. That was secondary. I mostly want to talk about leave to amend the first amended complaint and whether or not the existing complaint had already provided a Section 1983 free speech claim. The Government Accountability Project only represents whistleblowers. That's why I represent Dr. Pettit, because Dr. Pettit is a whistleblower. He went to the legislature in the year 1999-2000 session precisely because he said the university was just giving away the store when it came to the valuable pharmaceutical compounds that he and his staff at the Cancer Research Institute were developing. And then he found that Dr. Chang had submitted what he alleged to be a fraudulent patent application, and during the course of this investigation over that, which interviewed 17 witnesses, 900 pages of documents, he brought that all back to light again. Sotomayor, we're familiar with the facts. So on the request to amend, you're three years down the road in litigation. There's already been one amendment. What is the abuse of discretion on the part of Judge Silver to deny the motion to amend? Because the abuse of discretion standard, per the cases that we cited, and some very wrong-point decisions from the other circuits, basically say the abuse of discretion really depends on what grounds the district court is giving. Here, the district court gave delay, and although the district court said there was prejudice, the district court doesn't – did not cite any prejudice. We – there had not even been initial disclosures when I came to this case. There had been not one bit of discovery. There was a – the Rule 16 order hadn't even been adopted. All of the continuances had all been jointly agreed to by the State. This is a case that was long in the tooth, but was an absolute infant when it came to litigation. There had been no litigation. Don't our cases suggest that the district court has greater leeway to deny leave to amend when you're not coming forward with any new facts, right? I mean, you were trying to bring in a different legal theory, but based on the exact same facts that had been in the case for two, three years past, and I guess I thought our cases said in that circumstance, the district court has greater leeway to say, no, we're not – at this point in the litigation, we're not going to let you change horses in that fashion. Well, I'm not sure that – it's true. There is a phrase that seems to crop up in the various cases from time to time that basically say that the – where there's delay. But there's no case like this, I mean, because, after all, I mean, the precedence of this Court and the way you articulate rules of law are – have to at least acknowledge what the facts are. There's not a single case anywhere in the United States, I can tell, where anything like this has happened as a reported decision, where the case had not even gotten off the ground. And the party – and you had lawyers resign, you had both parties agreeing to all of this delay, and then you have – you have a new counsel coming in and said the first thing we ought to do is amend the complaint here and kind of dump all this – all of these crazy tort claims and state claims and amend this case and do what – really do it justice, because what it is is a whistleblower case. So – Help me understand. You seem to have two issues, and they seem to be a little bit confused, certainly in my mind. One is you appeal the denial of belief to amend with respect to First Amendment. And the second is your belief that the count – I think it was four – had a substantive due process claim. Now, we're talking about the first, I take it, the motion to – for leave to amend? Yes. All right. And with respect to that, on appeal, have you given us anything that would show that that claim would not have been futile? I mean, normally that would be the burden of the person objecting to the motion below. But here you say the judge erred and abused discretion. So what have you given us in the brief that would show that this public employee would have a First Amendment right that would have traction? So you mean it's just – if the court were to soon respond, they say, okay, let's put delay aside and go to the issue of futility. What do I have in the record? But you think that's in the briefs on that subject. No. Isn't that your burden here? Well, you know, I didn't view it as that way. I viewed myself pretty well bound by what took place with the judge below. And the judge below had gone just on the basis of delay and would not let us proceed on the argument then, which is our secondary argument, which is even if you don't let us amend, everything we need to assert these claims are in there. And so in opposition to the motion for summary judgment, we said we already have these cases. The merits are discussed there in the trial court record as to why there is a First Amendment claim as well as a Paul V. Davis claim. So we made that an explicit aspect, a major aspect of our opposition to summary judgment. The district judge never even addressed it. So as we are going to trial, we were preparing, Plaintiff was preparing to go forth with our First Amendment claim and Paul V. Davis because there was no order saying that we couldn't go forward. Our argument was we had to. And that is when my colleague, Ms. Herbst, basically said, well, I'm not going to let you get away with it, so I'm going to make a motion in limine to prevent you from going forward with that. And so at that point, the judge then did that. And we allege that as a, assert that here as a second ground for error. But the reality here is that, is that Dr. Pettit really, and I don't mean this rhetorically, Dr. Pettit has a right under Federal law to try to get justice. And Foreman V. Davis, maybe it is as antiquated as I am. Maybe Rule 15 doesn't mean anything anymore. But where you have a case in its infancy and you can't plead the most obvious claim, years before the case ever even goes to trial, before anything has ever happened, it's bad precedent. So help me understand. The motion to amend, which your first argument relates, would give you a right, if we agree, to a trial on the whistleblowing First Amendment claim, I gather. The second issue dealing in the motion in limine when the Court dismissed, that was a name-clearing substantive due process argument. If we agreed only on the second part, what would be the remedy? It wouldn't be a trial on the First Amendment claim. It would only be a name-clearing hearing. Is that right? Yes. That's really all I would have knelt to as a. And could we, I mean, it's possible the case will go back based on what, if we affirm the trial court, there is going to be some sort of hearing, is there not? Could that name-clearing hearing be part of that whatever occurs below? It could be. But the thing is, is the record is already there enough. If we were remanded, at least as far as plaintiff goes, we don't need any discovery. We are allowed to take all the discovery we wanted as things long afterwards, and Judge Silver let us go forward in essentially put on all the evidence we wanted as far as name-clearing hearing. She let us put on lots of First Amendment stuff. She goes, I'm going to let you put that stuff in. I granted the motion in limine, but I'll let you put it all in as an impeachment of whether or not these people, these high officials had motivations and somehow have kind of twisted the process. Because we were alleging that they knew that Dr. Petta had a right to a hearing, either under tenure for the CRI or under the Dalton Chair lifetime appointment, and that they very skillfully maneuvered this so that there would not be a hearing and the motivation was to retaliate against him. Well, let me go then to the chair itself. It does seem one of the concerns I have with Judge Silver's order has to do with not looking at the actual underlying documents. And the document contemplates that if you weren't the director, you wouldn't hold the chair. That's what the bequest document contemplates, correct? Yes. Okay. So if that's the case, and if we were to sustain the holding of the district court that there is no property right in the chair position and he no longer holds the chair. You mean the director? Excuse me, the director position, and then he no longer has that position and the chair is derivative of that, where do you get a property interest in the chair? Because we get a – first of all, it's not fair to say that Judge Silver didn't address it. Judge Silver entered numerous orders in this case. It's true she didn't address it in a final order, but she had addressed the Dalton Chair agreement previously. So I want to make that clear for the record. As to the linkage, our first response to that is that's a fact question. That's strictly a fact question. And it's true the contract, Mr. Dalton's contract, is one area of that fact question, but that contract itself is not a law. It's just one piece of evidence. And the judge looked at all this other evidence and said, hey, you removed him from CRI directorship that said he could still remain the chair. Obviously, you, University, don't see these things as a link. Well, can I ask you about that?  So you're right that he, even after he had his tenure – or not tenure, let me not say that. Even after his term as the director ended, he was allowed to stay on. And I gather it was because the university was in negotiations with representatives of the Dalton Trust to see if some arrangement could be worked out where maybe they'd be willing to modify the terms. No, I don't think so. Okay. There's no evidence in the record on that. Are they in negotiations with him, though, about what to do about the chair given that he's not the director? No. No. The first thing he learns about any of this, Dr. Pettit, is when he gets a notice suspending him, which, by the way, never makes any reference to any of this linkage. But the real issue here is, is that if it's a question of fact, then, was the judge in clear error, and what level of deference are you going to give to this judge who lived with this case, you know, for quite a long time, and cite some pretty persuasive evidence, including the fact that at trial, and Judge Silver asked a lot of questions, she basically was asking the university president, she goes, what's the status of the Dalton chair now? And the president says, oh, we're getting ready to fill it. What's the status of the CRI? Well, the CRI is kind of in a state of nothing's really happening with it now. And so Judge Silver says, so you guys don't in any way see this thing really as linked. And this kind of gets to the question that Judge Watford was asking, which is, isn't there some kind of a trust element to that? And I tried to get into that in the case, but the problem was the Dalton chair was so old, nobody really had any firsthand information about it. But suffice it to say, the argument we made there, and the argument that I would make here in response to that, is there's nothing self-executing about a trust agreement. I'm sure this Court has had numerous trust agreements over time in which they get the money, and then they just completely ignore what the terms of the trust agreement are. There's nothing that happens magically in the law on that that revokes the trust  You have a straight line. Ginsburg. Let me ask you then, if you go back for a due process hearing, which is basically then, and if we were to agree with Judge Silver that the directorship is out but the chair is in, so to speak, I take it you would go back for a hearing on whether or not Dr. Pettit could be removed from the chair. Would that be the focus of the hearing? That would be the focus as Judge Silver articulated it. So that the result of that hearing is not preordained. He might keep the chair and he might not as a result of the hearing? I mean, I take it that it's sort of like a brand-new proceeding and off you go. Absolutely. And I want to note that Judge Silver was concerned enough for what she heard at the hearing that she was concerned enough to have the chair of the trust of the university even holding that hearing. But she realized she didn't have the authority, so she strongly recommends you get somebody independent to look at this and view of all the evidence. Help me understand. Other than honor and glory as being the chair, if the salary is being paid by the university under the fact that he's a tenured professor, what's at stake here other than the honor of being the chair of this trust? Whether he has to teach sophomore classes or not is a real big part of it. He's a noted international cancer researcher, and that chair provided him enormous independence. I don't know what that property interest is. I mean, we don't know whether he'll have to teach sophomore chemistry or not, do we? I mean, I'm sorry. Does he have a research lab that's attached to the chair? There's not per se. It's attached to cancer research, though. Well, let me ask it a different way. Usually, chairs, the endowment for the chair throws off a certain amount of money that's used at the discretion of the holder of the chair, which either establishes a lab where the professor can use it for travel or research assistance and all that. Is that typical nature of a chair the nature of this chair? The nature of it, no. It actually doesn't necessarily have a lot of resources. Yes or no, does it have any resources other than its name? Yeah, millions of dollars. Okay. The chair. Absolutely. The Dalton Endowment that funds this chair has millions of dollars, and it says whoever occupies this chair will be a cancer researcher, not some teacher of with the Dalton chair imprimatur on it. The Dalton chair is incredibly prestigious in empowering and allowing the holder of it to continue with the research function. I know that's the end of my time. I did want to say one thing, and that is it's astounding to have a university here arguing that the president of the university, the provost, the highest deans, none of them have the authority to bind the ABOR in the total absence of policies. It's amazing. Arizona law is very clear. The university officials only have the authority of what's given to them by the Board of Regents. I'd like to answer a couple of questions if we may. Your Honor, you asked if there's discussions about whether Dr. Pettit could remain in the chair. There were. That's at ER 279, pages 30, 35, and 36, where the officials had discussed whether he could stay in the chair despite being removed from the directorship. This Court already acknowledged that contractually they were linked. That is what the district court should have followed. It's a legal issue. Moreover, under Arizona law, you have to show some intent by the board, and that's the problem here, that there is no intent by the board to give him this property right. Dr. Kinsinger even testified that the board should have approved Pettit's appointment to the Dalton chair, but the board minutes from 1986 make absolutely no reflection of the Dalton chair or his appointment. Even Dr. Kinsinger testified that they were trying to create an entity that wasn't covered by the board's policies. They had no authority to do so. It would be akin to the attorney general coming to my office and saying, Ms. Herx, you do a great job, we'd like you to work here forever. In 10 years, when there's another attorney general, I don't have a property right because he has no authority to do something that's not under the statutes. I assume that also indefinitely is not necessarily inconsistent with being, you know, that it doesn't necessarily mean irrevocable in this instance. Is that right? I mean, there is that testimony, well, you have it for life. Does that mean it couldn't be revoked? There's no authority to give him anything. I think you're exactly correct. And that's what President Crow did. He thought that Dr. Pettit should be, excuse me, it was Dr. Glick who decided to non-renew Dr. Pettit in the CRI directorship, and as a result of that, he was then removed from the Dalton chair. I think you understand our position on the leave to amend. It's particularly broad discretion. We would ask that you deny that. Thank you. Thank you. I thank both counsel for your arguments this morning. The case just argued of Pettit v. Capaldi is submitted.
judges: Zilly, McKeown, Watford